UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ELIZABETH ALLEN,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL FULLER and<br>XVSOUTH, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 23-10549 |

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiff Elizabeth Allen ("<u>Allen</u>"), by way of Complaint against defendants Michael Fuller ("<u>Fuller</u>") and XVSOUTH, LLC ("<u>XVSOUTH</u>," and together with Fuller, the "<u>Defendants</u>"), hereby alleges as follows:

### PARTIES

1. Plaintiff Allen is an individual residing in Mount Pleasant, South Carolina.

2. Defendant Fuller is an individual residing in Edgartown, Massachusetts.

3. Defendant XVSOUTH is a limited liability company organized under the laws of the Commonwealth of Massachusetts and has a principal place of business located in Edgartown, Massachusetts.

4. Based on information and belief, XVSOUTH's sole member is Fuller.

### JURISDICTION AND VENUE

5. This Court has jurisdiction over this civil action pursuant to both 28 U.S.C. §§ 1331 and 1332, and supplemental jurisdiction exists over Allen's state law claims pursuant to 28 U.S.C. § 1367.

6.     Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to this civil action occurred in this judicial district.

## FACTS

7.     Allen is a business professional specializing in the provision of financial consulting services.

8.     Fuller is a successful businessman and entrepreneur with, *inter alia*, substantial business interests, real estate holdings, and a domain name portfolio.

9.     In October 2014, Fuller and Allen began an approximate seven-year personal relationship.

10.     In early 2015, Allen assisted Fuller in preparing personal financial statements/schedules for the year ending December 31, 2014 and, in return, Fuller promised to assist Allen in starting a new business venture.

11.     In September 2016, Allen moved into Fuller's personal residence and lived with him for five years between his properties in Newton and Edgartown, Massachusetts.

12.     In January 2017, Fuller gifted Allen "Dayaway.com," a domain name with an estimated fair market value of $10,000 at the time and an estimated cost basis of $4,000.

13.     After Allen was gifted "Dayaway.com," the domain name was transferred to her and, thereafter, she was the sole owner to the domain name via the Godaddy.com platform.

14.     At this time, Fuller was also the founder, Chief Executive Officer and sole member and manager of InterRail, LLC ("InterRail"), an online brokerage that allows travelers to book rail tickets and passes throughout Italy and other European destinations (www.ItaliaRail.com).

15.     On August 27, 2018, Allen, a Certified Public Accountant at the time, became employed by InterRail as the company's Director of Special Projects with an annual salary of $120,000.00.

16.    As InterRail's Director of Special Projects, Allen reported to Pascal Tellier, the acting Chief Operating Officer, but Fuller retained control over and was intimately involved in all aspects of the business.

17.    As InterRail's Director of Special Projects, Allen was responsible for, *inter alia*, assessing the company's audit, tax and legal issues, and, of note, Allen was also charged with effectuating a restructuring of InterRail.

18.    The restructuring of InterRail was completed on December 31, 2018.  Allen continued to be employed by InterRail and performed services on several other projects, including, *inter alia*, a healthcare plan for the company's employees and an office building acquisition.

19.    In February 2020, the COVID-19 pandemic decimated the travel industry, especially throughout Europe.  This caused Fuller, as InterRail's Chief Executive Officer, to lay off most of the company's employees, including Allen.

20.    Shortly after being laid off, Allen was rehired by InterRail.  On December 3, 2020, Allen's employment with InterRail was terminated.

21.    Nonetheless, during the COVID-19 pandemic, Mr. Tellier left his InterRail employment and Allen began reporting directly to Fuller.  Fuller began to blur the lines between his personal ventures and InterRail even more, and mandated that Allen assist with his personal business pursuits, applying for federal loans, identifying savings on taxes, maximizing the value of his real estate, staging and selling his real estate assets and minimizing his business/property expenses.

22.    On July 20, 2018, Fuller purchased a residential investment property located at 15 South Street, Edgartown, Massachusetts (the "Property") for $3,900,000 and the furnishings located therein for $100,000.

3

23.     Initially, Fuller managed the Property through opening accounts, paying bills and handling most communications.

24.     On April 9, 2019, Fuller organized XVSOUTH to hold title to the Property and manage the Property's lucrative short-term rental business.

25.     At all times, Fuller has been the sole member and manager of XVSOUTH and, therefore, controlled, directed and participated to a substantial degree in formulating and determining XVSOUTH's business practices and policies.

26.     The Property was used as a short-term rental, Airbnb-type investment property for the purpose of generating revenue for XVSOUTH and/or Fuller.

27.     Beginning in or about May 2019, Fuller directed Allen to manage XVSOUTH. Accordingly, Allen took over the preparation of annual financial statements and year-round rental responsibilities, including, *inter alia*, managing subcontractors, paying invoices, making deposits, creating and maintaining a rental calendar, and handling all communications and documentation. Allen was also responsible for the purchasing of supplies and performing maintenance, and, while on property, Allen personally cleaned and organized.

28.     Although Allen was responsible for the day-to-day management of XVSOUTH, Fuller continued to exert control over Allen's management of the Property through his approval of rental rates, subcontractors, rental agents, tenants, and generally purchases over $2,500.

29.     In 2020, the demands of managing XVSOUTH increased as a result of the COVID-19 pandemic as Allen was required to rebook and reschedule rentals, implement new cleaning procedures, oversee the drafting and execution of COVID-19 legal liability waivers and provide on-island supervision.

30.    On or about March 17, 2021, Fuller and Allen met at the Property.  During this meeting, Fuller directed Allen to prepare the Property for sale at the anticipated asking price of $7,000,000, and, as an incentive, Fuller promised to pay Allen a commission totaling 5% of the purchase price.

31.    Accordingly, beginning approximately March 18, 2021, Allen prepared the Property to be listed and marketed for sale by, *inter alia*: cleaning; decluttering; organizing; refurbishing; painting; replacing the guest house's outdated bathroom cabinets, lighting and mirrors; staging the interior and exterior of the Property's main, guest and pool houses; displaying recently purchased towels and linens; arranging for professional photographs to be taken; and reviewing and revising marketing materials.

32.    Allen used her personal furniture valued at approximately $50,000 to stage the Property's guest and pool houses.

33.    On or about May 7, 2021, and as a result of Allen's efforts, the Property was listed for sale at the price of $6,900,000, inclusive of all furniture.

34.    After the Property was listed for sale, Allen then continued preparing the Property for the rental season which started June 7, 2021.

35.    On or about May 20, 2021, Allen was diagnosed with cancer.

36.    After Allen's cancer diagnosis, her relationship with Fuller turned toxic.  In particular, Fuller began making grossly insensitive comments such as "I'm going to work you like a dog" and that he was working "100 times harder" than she was.  Fuller also mocked Allen's cancer treatment by texting Allen a picture of himself with a hot dog on his face.  Moreover, Fuller began yelling at Allen more frequently and criticizing her limited physical capacity.

37.     While Allen was receiving treatment, Fuller began fielding inquiries into the sale of the "Dayaway.com" domain name.  In particular, on July 29, 2021, Fuller was contacted by a domain name broker who stated:

> I'm trying to find the owner(s) of the domain name DayAway.com. It used to be under your name, but now it's under an "Elizabeth Allen."  I'm not sure if you have any connection, but the reason I am reaching out is because I am working with a client who has expressed interest in acquiring it.  Can you please confirm you do or do not own this domain?

38.     Fuller contacted and began negotiating with the foregoing domain name broker, and, in response, the domain name broker responded "thanks for your call.  I think there's a tough hill to climb to get my client north of $50,000, but I'd like to keep the conversation going."

39.     Fuller notified Allen that he was garnering interest in "Dayaway.com," but she did not want to sell the domain name.

40.     Allen's unwillingness to sell her "Dayaway.com" domain name infuriated Fuller. On July 30, 2021, Fuller sent Allen a text message stating, in relevant part:

> You guilted me into EVERYTHING – it was planned and manipulated – probably consciously but definitely subconsciously; you used your so-called emotional support as a weapon; you just kept going because it was working for you – FREE Accommodation; . . . over $300K in salary and credit card access; . . . DayAway.com – likely worth at least $250K; . . . 5% of the sale of XV South – what an amazing manipulator you are in 6 years you managed to ALMOST get more than my ex-wife who was with me for 26 y[ea]rs.  It stops now . . . I am not selling XV South if you think you are entitled to anything for it . . .

41.     Again, on August 25, 2021, the morning after Allen received reconstructive surgery, Fuller continued to negotiate with the domain name broker for the sale of the "Dayaway.com" domain name without Allen's authority.

42. Despite Fuller's threats, on October 21, 2021, the Property and all of its furnishings were sold to a third-party for $6,250,000 and $250,000, respectively.

43. Allen agreed to include her furniture in the sale of the Property after Fuller promised to reimburse her for the replacement value of her furniture.

44. Fuller and/or XVSOUTH have failed and refused to pay Allen a 5% commission on the sale of the Property, which would have totaled $312,500.

45. Fuller and/or XVSOUTH have failed and refused to pay Allen the replacement value of her furniture for which XVSOUTH received an approximate $50,000 benefit in connection with the sale of the Property.

46. On October 26, 2021, Fuller received an email from the same domain name broker offering to purchase the "Dayaway.com" domain name for $175,000.

47. Fuller implicitly claims that he is the owner of "Dayaway.com" and has represented himself as the owner of the domain name to the domain name broker.

48. On November 13, 2021, Fuller, while intoxicated, forcefully and intentionally struck Allen on her left arm. After doing so, Fuller further intimidated Allen by saying "what are you going to do? Call the police?"

49. Allen then spoke to a police officer who completed a police report and arrested Fuller. Allen also completed a witness statement at Martha's Vineyard Hospital.

50. Allen has not spoken to Fuller since he struck her on November 13, 2021.

51. Fuller is the sole member of XVSOUTH and exercised pervasive control over the company.

52. Fuller intermingled the business activities and management of XVSOUTH with his many other business ventures.

7

53. XVSOUTH, as a single-purpose entity, was thinly capitalized.

54. Fuller failed to observe corporate formalities in the operations of XVSOUTH. For example, based on information and belief, XVSOUTH did not have an operating agreement and the company's income/losses were reported on Fuller's personal tax returns.

55. Based on information and belief, XVSOUTH is insolvent given the sale of its sole asset – the Property.

56. On or about March 3, 2023, Allen filed a non-payment of wage complaint with the Attorney General's Office.

57. On or about March 6, 2023, Allen received a private right to sue letter from the Attorney General's Office.

## COUNT I
## DECLARATORY JUDGMENT
### (Allen v. Fuller)

58. Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 57 as if the same were fully set forth at length herein.

59. An actual controversy exists between Allen and Fuller as to Allen's ownership of the "Dayaway.com" domain name.

60. Fuller gifted the domain name to Allen and she has retained exclusive access to the domain name via the Goddaddy.com platform as of approximately December 2020.

61. Fuller implicitly claims that he is the owner of "Dayaway.com" and has represented himself as the owner to third-party domain name brokers, despite having gifted the domain name to Allen in January 2017.

62. In light of the conflicting positions, the dispute regarding the ownership of "Dayaway.com" domain name can only be determined by declaratory judgment. Allen requests an

order declaring that she is the owner of the "Dayaway.com" domain name and that Fuller has no rights in connection therewith.

**COUNT II**
**BREACH OF CONTRACT AND THE COVENANT OF**
**GOOD FAITH AND FAIR DEALING**
**(Allen v. Defendants)**

63.   Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 62 as if the same were fully set forth at length herein.

64.   A valid and binding contract existed between Allen and Defendants pursuant to which Allen was to prepare the Property for marketing and sale and, in exchange, Defendants agreed to pay Allen a 5% commission on the sale of Property.

65.   A valid and binding contract existed between Allen and Defendants pursuant to which Allen agreed to include her furniture in the Sale of the Property and, in exchange, Defendants agreed to pay Allen the replacement value of her furniture estimated at $50,000.

66.   Allen fully performed her obligations under the foregoing contract by preparing the Property for marketing and sale.

67.   Allen fully performed her obligations under the foregoing contract by providing her furniture for which Defendants received an approximate $50,000 benefit in connection with the sale of the Property.

68.   On or about October 21, 2021, the Property and all of its furnishings were sold to a third-party for $6,250,000 and $250,000, respectively.

69.   Defendants materially breached the foregoing contract by failing and refusing to pay Allen a 5% commission on the sale of the Property totaling $312,500.

70.   Defendants materially breached the foregoing contract by failing and refusing to pay Allen the replacement value of her furniture in an amount not less than $50,000.

9

71.     Defendants' failure and refusal to pay Allen a 5% commission on the sale of the Property or the replacement value of her furniture also constitutes a breach of the implied covenant of good faith and fair dealing inherent in their contract(s) with Allen.

72.     As a direct and proximate result of Defendants' material breaches of contract and the implied covenant of good faith and fair dealing inherent therein, Allen has suffered damages in an amount to be determined at trial.

**COUNT III**
**VIOLATION OF G.L. c. 149, § 148 – FAILURE TO PAY WAGES**
**(Allen v. Defendants)**

73.     Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 72 as if the same were fully set forth at length herein.

74.     At all relevant times, Allen was an employee of XVSOUTH.

75.     At all relevant times, Fuller was the sole member and manager of XVSOUTH and, therefore, controlled, directed and participated to a substantial degree in formulating and determining XVSOUTH's business practices and policies.

76.     Fuller, on behalf of XVSOUTH, directed Allen to prepare the Property for marketing and sale, and, in exchange, promised to compensate her via a 5% commission on the purchase price.

77.     Allen rendered valuable services for Defendants' benefit in preparing the Property for marketing and sale.

78.     As a result of Allen's efforts, the Property was sold to a third-party for $6,250,000 on October 21, 2021.

79.     XVSOUTH, at Fuller's sole direction, has refused and failed to pay Allen the agreed-to 5% commission that she was entitled to receive in connection with the sale of the Property totaling $312,500.

80.     Defendants' failure to timely pay Allen the wages she earned constitutes a violation of G.L. c. 149, §§ 148, 150.

81.     As a direct and proximate result of Defendants' statutory violations, Allen has suffered damages in an amount to be determined at trial, including, without limitation, treble damages, interest, attorneys' fees and costs.

**COUNT IV**
**VIOLATION OF G.L. c. 151, § 1 – FAILURE TO PAY MINIMUM WAGE**
**(Allen v. Defendants)**

82.     Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 81 as if the same were fully set forth at length herein.

83.     At all relevant times, Allen was an employee of XVSOUTH.  Allen carried out all necessary services to operate XVSOUTH's short-term rental business before the Property was sold.

84.     At all relevant times, Fuller was the sole member and manager of XVSOUTH and, therefore, controlled, directed and participated to a substantial degree in formulating and determining XVSOUTH's business practices and policies.

85.     At all relevant times, XVSOUTH, at Fuller's control and direction, required Allen to work substantial time for XVSOUTH's benefit.

86.     XVSOUTH failed to compensate Allen at all, let alone at or above Massachusetts minimum wage in violation of G.L. c. 151, § 1 and 454 CMR 27.03.

87. As a direct and proximate result of Defendants' statutory violations, Allen has suffered damages in an amount to be determined at trial, including, without limitation, treble damages, interest, attorneys' fees and costs.

## COUNT V
## FAILURE TO PAY MINIMUM WAGE IN VIOLATION OF FLSA
### (Allen v. Defendants)

88. Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 87 as if the same were fully set forth at length herein.

89. At all relevant times, Allen was an employee of XVSOUTH.  Allen carried out all necessary services to operate XVSOUTH's short-term rental business before the Property was sold.

90. At all relevant times, the Fair Labor Standards Act ("FLSA") required that employees shall not be paid less than minimum wage for all hours worked.  The Defendants have failed to provide Allen with any compensation for the many hours of work she performed for XVSOUTH's benefit, let alone the minimum wage in violation of 29 U.S.C. § 206(a)(1).

91. Defendants' violations of the FLSA as alleged herein have been done in an intentional, willful and bad faith manner.

92. As a direct and proximate result of the aforesaid willful violations of the FLSA, minimum wages have been unlawfully withheld by Defendants from Allen for which Defendants are liable in an amount to be determined at trial, together with an additional equal amount as liquidated damages, interest, attorney's fees and costs.

93. Defendants are under a duty imposed by the FLSA, 29 U.S.C. § 211(c), to maintain and preserve payroll and other employment records with respect to Allen from which the amounts of the Defendants' liability can be ascertained.

**COUNT VI**
**VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT**
**(Allen v. Defendants)**

94.     Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 93 as if the same were fully set forth at length herein.

95.     At all relevant times, Allen was an employee of XVSOUTH.

96.     Allen, a woman, had a recognized disability during her XVSOUTH employment and was thus a member of a protected class.

97.     At all relevant times, XVSOUTH has employed fewer than six (6) individuals.

98.     Defendants' actions in, *inter alia*, refusing to honor Allen's contracts, refusing to compensate Allen fully for the goods and services provided, and Fuller's physical and emotional abuse of Allen interfered with and violated Allen's fundamental right to be free of sex-based discrimination under Article CVI of the Massachusetts Constitution, which provides, in part, that "[e]quality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

99.     Defendants' actions in, *inter alia*, refusing to honor Allen's contracts, refusing to compensate Allen fully for the goods and services provided, and Fuller's physical and emotional abuse of Allen interfered with and violated Allen's fundamental right to be free of disability-based discrimination under Article CXIV of the Massachusetts Constitution, which provides, in part, that "[n]o qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth."

100.    Defendant's actions in, *inter alia*, refusing to honor Allen's contracts, refusing to compensate Allen fully for the goods and services provided, and Fuller's physical and emotional

abuse of Allen interfered with and violated Allen's fundamental rights under the Massachusetts Constitution through  threats, intimidation and/or coercion.

101.    As a direct and proximate result of Defendants' violation of the Massachusetts Civil Rights Act, Allen has suffered damages in an amount to be determined at trial, including, without limitation, compensatory damages, emotional distress damages, interest, attorneys' fees and costs.

### COUNT VII
### VIOLATION OF THE MASSACHUSETTS EQUAL RIGHTS ACT
#### (Allen v. Defendants)

102.    Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 101 as if the same were fully set forth at length herein.

103.    At all relevant times, Allen was an employee of XVSOUTH.

104.    Allen, a woman, had a recognized disability during her XVSOUTH employment and was thus a member of a protected class.

105.    At all relevant times, XVSOUTH has employed fewer than six (6) individuals.

106.    The Massachusetts Equal Rights Act, G.L. c. 93, § 102(a), provides, in relevant part:

> All persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

107.    The Massachusetts Equal Rights Act, G.L. c. 93, § 103(a), provides, in relevant part:

> Any person within the commonwealth, regardless of handicap or age as defined in chapter one hundred and fifty-one B, shall, with

14

reasonable accommodation, have the same rights as other persons to make and enforce contracts, inherit, purchase, lease, sell, hold and convey real and personal property, sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, including, but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution.

108. Defendants have violated the Massachusetts Equal Rights Act by depriving Allen, a disabled woman, the right to make and enforce contracts by, *inter alia*, refusing to honor Allen's contracts, refusing to compensate Allen fully for the goods and services provided, and Fuller's physical and emotional abuse of Allen.

109. As a direct and proximate result of Defendants' violation of the Massachusetts Equal Rights Act, Allen has suffered damages in an amount to be determined at trial, including, without limitation, compensatory damages, exemplary/punitive damages, emotional distress damages, interest, attorneys' fees and costs.

## COUNT VIII
## QUANTUM MERUIT
### (Allen v. XVSOUTH)

110. Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 109 as if the same were fully set forth at length herein.

111. Allen performed services for the benefit of the XVSOUTH, including, without limitation, preparing the Property for marketing and sale and operating the company's short-term rental business.

112. Allen rendered services for the benefit of XVSOUTH with the reasonable expectation of being compensated by XVSOUTH in the amount of a 5% commission on the purchase price of the Property.

113. Allen rendered services for the benefit of XVSOUTH with the reasonable expectation of being compensated no less than the mandatory minimum wage rate.

114. XVSOUTH, having reason to believe that Allen was acting with the expectation of being compensated, permitted Allen to render services without objection.

115. XVSOUTH has unjustly retained the benefit of Allen's services without compensating her.

116. As a direct and proximate result of XVSOUTH's actions, Allen has suffered damages in an amount to be determined at trial.

**COUNT IX**
**UNJUST ENRICHMENT**
**(Allen v. Defendants)**

117. Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 116 as if the same were fully set forth at length herein.

118. Allen conferred benefits upon Defendants in the form of her services and valuable furniture in connection with the rental and sale of the Property.

119. Defendants acknowledged and benefited from Allen's services and the provision of her furniture.

120. Defendants accepted and retained the benefit of Allen's goods and services, have utterly failed to compensate Allen whatsoever in connection therewith, and have retained the benefit of Allen's goods and services under circumstances which make such acceptance and/or retention inequitable.

121. As a direct and proximate result of Defendants' actions, Allen has suffered damages in an amount to be determined at trial.

### COUNT X
### CONVERSION
### (Allen v. Defendants)

122. Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 121 as if the same were fully set forth at length herein.

123. Allen owned and had right to immediate possession of valuable furniture that was used to stage the Property's guest and pool houses, plus additional furniture and other personal property that remains within Fuller's warehouse and possibly his personal residence.

124. Defendants converted Allen's personal property to their own use by agreeing to sell Allen's furniture to the purchaser of the Property without compensating Allen for the replacement value of her furniture.

125. Fuller has further converted Allen's personal property to his own use by retaining possession within his warehouse and possibly his personal residence.

126. Defendants' actions have deprived Allen her rightful ownership in the valuable furniture and other personal property.

127. As a direct and proximate result of Defendants' actions, Allen has suffered damages in an amount to be determined at trial.

### COUNT XI
### ASSAULT AND BATTERY
### (Allen v. Fuller)

128. Allen repeats and incorporates by reference the allegations in Paragraphs 1 through 127 as if the same were fully set forth at length herein.

129. Fuller acted with the intent of causing a harmful or offensive contact with Allen and, as a direct result, Fuller harmfully contacted Allen's arm.

130.     As a direct and proximate result of Fuller's actions, Allen has suffered damages in an amount to be determined at trial.

## PRAYERS FOR RELIEF

**WHEREFORE**, Allen respectfully requests that this Honorable Court:

i.  Enter judgment in Allen's favor and that she be awarded damages in an amount to be determined at trial, together with compensatory damages, exemplary/punitive damages, liquidated damages, treble damages, emotional distress damages, interest, reasonable attorneys' fees, and the costs of this action; and

ii.  Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Allen demands a trial by jury on all claims so triable.

Dated: March 13, 2023                        Respectfully submitted,

**ELIZABETH ALLEN**,
By her attorneys,


*/s/ Michael A. Bednarz*
Robert R. Berluti (BBO #039960)
Michael A. Bednarz (BBO #689047)
**BERLUTI MCLAUGHLIN & KUTCHIN LLP**
44 School Street, 9th Floor
Boston, MA 02108
Tel:    (617) 557-3030
Fax:    (617) 557-2939
Email: rberluti@bmklegal.com
           mbednarz@bmklegal.com