UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ELIZABETH ALLEN, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 23-CV-10549-AK |
| MICHAEL FULLER and XVSOUTH, LLC, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS' PARTIAL
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**ANGEL KELLEY, D.J.**

Plaintiff Elizabeth Allen brought this action against Defendants Michael Fuller and XVSOUTH, LLC ("XVSOUTH") on March 13, 2023. [Dkt. 1]. In her Amended Complaint, Allen asserts twelve claims, including breach of contract, violations of the Massachusetts Wage Act, violations of the Fair Labor Standards Act ("FLSA"), violations of the Massachusetts Civil Rights Act ("MCRA"), violations of the Massachusetts Equal Rights Act ("MERA"), quantum meruit, unjust enrichment, conversion, and assault and battery. [Dkt. 32]. Defendants jointly move for summary judgment on seven of Allen's claims. [Dkt. 54]. For the reasons set forth, Defendants' Motion for Partial Summary Judgment [Dkt. 54] is **GRANTED IN PART** and **DENIED IN PART**.

**I.    BACKGROUND**

Unless otherwise noted, the following facts are drawn from the summary judgment record and the Amended Complaint and are undisputed or viewed in the light most favorable to the nonmovant.

1

A.  **Factual Background**

Allen and Fuller began a romantic relationship in 2014. Allen moved into Fuller's Newton, Massachusetts home in September 2016, where they lived together until the home was sold in December 2020. [Dkt. 56 at 2]. In August 2018, Allen began working for InterRail, LLC, an online brokerage founded and led by Fuller, as the Director of Special Projects. [Id. at 3]. An offer dated August 27, 2018 (signed on or about February 27, 2020) formalized Allen's role and reporting line to Fuller. [Dkt. 32 at 3]. Allen was verbally laid off during the COVID-19 pandemic and formally terminated in writing on December 3, 2020. [Dkt. 32 at 4].

Fuller purchased 15 South Street, Edgartown, Massachusetts (the "Property") on July 20, 2018, for $3,900,000. [Id. at 4]. In April 2019, he formed XVSOUTH to hold and operate the Property as a short-term rental. [See id. at 5.] In preparation for the purchase of the Property, Fuller texted Allen: "You could be property manager as well and I pay you maybe?" [Dkt. 64-1 at 59]. Allen alleges that from 2018 to 2021, the Property was used as an Airbnb-type investment property to generate revenue and maximize tax deductions, while Fuller and his family also used it for personal and recreational stays. [Dkt. 32 at ¶¶ 40, 48-49]. Around Spring 2019, Allen began spending more time at the Property and performing operational work related to short-term rentals. [Dkt. 64 at 21-22]. She lived and worked on-site from September 2020 through June 2021, allegedly performing upkeep. [Dkt. 32 at ¶ 47]. During this period, Allen handled substantial day-to-day management: preparing annual income statements; maintaining a rental calendar; coordinating with subcontractors; paying invoices and making deposits; purchasing supplies; and, while on the island, cleaning, organizing, and performing upkeep. [Id. at ¶¶ 41-42]. Fuller retained control over rental rates, subcontractors, rental agencies, tenant

selection, and purchases over $2,500. [Id. at ¶ 42]. He also represented to third parties that Allen served as the Property's manager. [See id. at ¶ 31].

In April 2019, Allen drew up a list of expectations for her work at the Property including "manag[ing] the properties" and "guest book," maintaining a rental calendar, and cleaning the property. [Dkt. 64 at ¶ 112]. Allen and Fuller both coordinated with contractors, vendors, and rental agencies in connection with the Property. [Dkt. 56 at 5]. From 2018-2021, XVSOUTH and Fuller reported on Schedule E, Part I of their tax returns that all expenses spent in connection with the Property were business expenses. [Dkts. 32 at ¶ 49; 67-1 at ¶ 28]. Allen alleges that, between May 2019 and July 2020, she charged approximately $25,000 on her personal credit card for Property goods—roughly $15,000 for decorative lighting and accessories in 2019 and $10,000 for towels, bedding, and linens in 2020—expecting reimbursement (the "XVSOUTH Reimbursement"). [Dkt. 32 at ¶ 39]. She and Fuller also used checking accounts associated with XVSOUTH and Vineyard Touch in connection with Property expenses. [See id. at ¶ 38]. In 2020, pandemic-related rebookings, enhanced cleaning protocols, liability waivers, and on-island supervision increased Allen's workload. [Id. at ¶ 44].

On or about March 17, 2021, Fuller told Allen he intended to sell the Property and directed her to prepare it for sale at an anticipated asking price of $7,000,000.00. [Id. at ¶ 50]. Allen alleges Fuller promised to pay her a 5% commission on the sale price in exchange for preparing, staging, and marketing the Property, and later agreed to reimburse the replacement value of the personal furniture she used to stage the guest and pool houses (estimated at $50,000). [Id. at ¶¶ 50-53, 61]. Beginning March 18, 2021, Allen undertook extensive work: cleaning; decluttering; organizing; refurbishing; painting; replacing cabinets, lighting and mirrors; staging interiors and exteriors; arranging professional photography; and revising

3

marketing materials. [Id. at ¶ 51]. The Property was listed on May 7, 2021 for $6,900,000 (inclusive of furnishings), and realtor showings began May 14, 2021. [Id. at ¶ 53]. On October 21, 2021, the Property sold for $6,250,000, and the furnishings sold for $250,000. [Id. at ¶ 60]. Allen agreed to the sale of her furniture based on Fuller's promise to reimburse its replacement value. [Id. at ¶ 61].

Around the same time as listing the Property for sale, Allen was diagnosed with cancer on or about May 21, 2021. [Id. at ¶ 55]. She alleges that after her diagnosis, Fuller's conduct became hostile and demeaning towards her, including making insensitive comments about her condition and threats to "work [her] like a dog." [Id. at ¶ 56]. On November 13, 2021, Allen alleges Fuller, while intoxicated, intentionally struck her left arm; the police were contacted and Fuller was arrested. [Id. at ¶¶ 64-65].

### B.     Procedural Background

As to wage-act prerequisites, Allen filed a nonpayment-of-wages complaint with the Massachusetts Attorney General's Office on or about March 3, 2023 and received a private right-to-sue letter on or about March 6, 2023. [Dkt. 32 at ¶¶ 72-73]. Allen filed her complaint against Fuller and XVSOUTH on March 13, 2023. [Dkt. 1]. Defendants answered and asserted counterclaims for false imprisonment and intentional infliction of emotion distress. [Dkt. 12 at 16]. Allen moved to dismiss the counterclaims pursuant to the Anti-SLAPP statute, which the Court denied on July 24, 2023, concluding the claims were colorable and not based solely on petitioning activity. [See Dkts. 16; 23 at 2-4]. Allen subsequently filed an amended complaint on March 19, 2024. [Dkt. 32].

Defendants now jointly move for partial summary judgment on seven of Allen's claims. [Dkt. 54]. In her opposition, Allen voluntarily dismissed three claims: failure to pay minimum

wage in violation of FLSA (Count IV), violation of MCRA (Count V), and MCRA retaliation (Count VI). [Dkt. 63 at 2]. The motion thus addresses the following remaining claims: failure to pay wages under Mass. Gen. Laws ch. 149, § 148 (Count II), failure to pay minimum wage under Mass. Gen. Laws ch. 151, § 1 (Count III), violation of MERA (Count VII), and MERA retaliation (Count VIII). [Id.].

## II.   LEGAL STANDARD

Summary judgment is designed to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). It is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020). A "genuine" dispute exists if "a reasonable fact-finder could return a verdict for the nonmoving party based on the evidence" and a fact is "material" if it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006). Courts must evaluate "the record and [draw] all reasonable inferences therefrom in the light most favorable to the non-moving parties." Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183-84 (1st Cir. 1999)). The non-moving party may defeat summary judgment only by pointing to specific facts "demonstrating . . . that a trialworthy issue persists." Paul, 948 F.3d at 49 (quotation omitted). Conclusory allegations, improbable inferences, and unsupported speculation are insufficient. See Mesnick, 950 F.2d at 822.

## III.  DISCUSSION

### A.  Counts II and III: Wage Claims

Allen asserts claims under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, and the Massachusetts Minimum Fair Wage Law, Mass. Gen. Laws ch. 151, § 1. [Dkt. 32 at 12-14]. The Wage Act requires employers to pay all earned wages in a timely fashion and forbids retaliation against employees asserting their statutory rights. MASS. GEN. LAWS ch. 149, §§ 148, 148A; Crocker v. Townsend Oil Co., 979 N.E.2d 1077, 1082-83 (Mass. 2012). The Minimum Fair Wage Law establishes the minimum hourly wage and imposes liability for unpaid wages and treble damages. See MASS. GEN. LAWS ch. 151, §§ 1, 20; Rosnov v. Molloy, 952 N.E.2d 901, 905 (Mass. 2011). To prevail on a claim under the Wage Act, a plaintiff must show: (1) an employment relationship; (2) that the wages at issue were "earned" under the statute; and (3) that the employer failed to pay them when due. See Somers v. Converged Access, Inc., 911 N.E.2d 739, 747-48 (Mass. 2009).

Allen provided services to Fuller under circumstances that, viewing the evidence in her favor, could constitute an employment relationship. The dispute centers on whether Fuller failed to remit earned wages to Allen as an employee and, if so, in what amounts. [Dkt. 32 at 12-13]. Allen offers evidence that she was not paid for her services as property manager nor in preparing for the sale of the house. The record reflects evidence of unpaid proceeds from her services preparing the house for sale, including a commission from the sale of the property. [Dkt. 64 at 10-11]. The record also reflects that Allen was not compensated for the services she performed in the oversight of the property for short-term rentals. [Id.]. These amounts were neither contested contemporaneously nor paid later. Fuller maintains that all sums due were paid, or that disputed amounts are not "wages" within the statutory meaning. [Dkt. 56 at 5-6]. Fuller

6

additionally argues that Allen was not an employee of his, and thus their relationship falls outside the scope of the Wage Act statutes. [Dkt. 55 at 13-14]. Citing the test in Jinks, Fuller urges this Court to apply a test narrowly used in a joint employment case to find that Allen was not an employee. [Id. at 14-15]; see Jinks v. Credico (USA) LLC, 177 N.E.3d 509, 520 (Mass. 2021). Conversely, Allen argues that the more appropriate test in determining whether she is an employee comes directly from the statute she is bringing her claim under, Mass. Gen. Laws ch. 149, § 148B. [Dkt. 63 at 12-13]. The Court need not reach a conclusion on which test is appropriate here. Whether the disputed sums qualify as "earned" wages or meet the minimum wage threshold due to Allen's designation as an employee turns on factual questions, including the terms of the agreement, the nature of the work performed, and the timing of payments. Construing the record in Allen's favor, there is sufficient evidence for a reasonable jury to conclude that Fuller violated the Wage Act and the Minimum Fair Wage Law. Summary judgment is therefore denied as to Counts II and III.

### B.   Counts VII and VIII: MERA Claims

Allen asserts two claims under the Massachusetts Equal Rights Act ("MERA"), Mass. Gen. Laws ch. 93, §§ 102, 103: Count VII (discrimination) and Count VIII (retaliation). The Court addresses each in turn.

#### 1. Count VII — Discrimination

MERA guarantees all persons "the same rights enjoyed by white male citizens[] to make and enforce contracts . . . and to the full and equal benefit of all laws[.]" MASS. GEN. LAWS ch. 93, § 102. Massachusetts courts interpret MERA by reference to analogous federal civil rights statutes, including 42 U.S.C. § 1981 and § 1982, for guidance, which require proof of intentional discrimination affecting protected rights. See Currier v. Nat'l Bd. of Med. Exam'rs, 965 N.E.2d

7

829, 839-41 (Mass. 2012); LaCava v. Lucander, 791 N.E.2d 358, 366 (Mass. App. Ct. 2003) (citing Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 17 (1st Cir. 1989)).

      Allen alleges that Fuller's nonpayment and certain statements were based on her sex and disability status. She urges the Court to apply MERA's "totality of the circumstances" language, see Mass. Gen. Laws ch. 93, § 102(c), while Fuller advocates for the McDonnell Douglas framework borrowed from Mass. Gen. Laws ch. 151B precedent. [See Dkts. 63 at 20; 55 at 21]; see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (holding the complainant has the initial burden of establishing a prima facie case of employment discrimination); Frankina v. First Nat'l Bank of Bos., 801 F. Supp. 875, 880 (D. Mass. 1992), aff'd, 991 F.2d 786 (1st Cir. 1993) (applying Mass. Gen. Laws ch. 151B test to MERA claims)). The record fails to establish a triable issue under either approach. There is no evidence Allen did not enjoy the same contractual rights as a white male citizen because of Fuller's actions, that she was terminated or replaced, nor that Fuller's conduct deprived her of contractual rights because of her sex or disability. While the Court does not condone the alleged conduct, the Court fails to see how the alleged statements rise to the level of discrimination or inhibited Allen's contractual rights. In addition, the Court fails to see how the alleged failure to pay was in any way related to Allen's sex or disability or that her sex or disability interfered with her ability to enter contracts. See Doe v. Williams Coll., 530 F. Supp. 3d 92, 116-17 (D. Mass. 2021) (granting summary judgment to defendant where plaintiff failed to demonstrate that actions taken against him were due to his gender). Said simpler, there is no evidence connecting a discriminatory animus to her contractual rights, so summary judgment is warranted on Count VII.

2. Count VIII — Retaliation

MERA contains no express anti-retaliation language, but courts may imply such protections consistent with analogous civil rights statutes.  See Gomez-Perez v. Potter, 553 U.S. 474, 481 (2008).  Under the § 1981 framework, a plaintiff must show: (1) engagement "in protected conduct (such as complaining of unlawful discrimination);" (2) a materially adverse employment action (such as an alteration of conditions of employment); and (3) "a causal connection between the protected conduct and the adverse employment action."  Lima v. City of E. Providence, 17 F.4th 202, 209 (1st Cir. 2021).

Here, the record fails to establish that Allen engaged in protected conduct sufficient to invoke retaliation protections.  Allen asserts that Defendants retaliated against her, principally by filing counterclaims, after she asserted her rights.  This Court has already determined those counterclaims are colorable and not brought solely to retaliate.  [Dkt. 23 at 2-4].  Without evidence of protected activity or causation, the retaliation claim fails as a matter of law.  Summary judgment is therefore granted on Count VIII.

IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' Motion for Partial Summary Judgment [Dkt. 56].  The motion is **GRANTED** as to Counts VII and VIII, alleging MERA discrimination and retaliation, which are **DISMISSED**.  It is **DENIED** as to Counts II and III, alleging violations of the Wage Act and Minimum Fair Wage Law, which shall proceed.  Counts IV, V, and VI, asserting FLSA and MCRA claims, have been **VOLUNTARILY DISMISSED**.

  IT IS SO ORDERED.

Dated: August 20, 2025                               /s/ Angel Kelley
                                                     Hon. Angel Kelley
                                                     United States District Judge